STANDARD STOCK FARM *et al. v.* NATIONAL TROTTING ASS'N *et al.*

(*Supreme Court, Special Term, Erie County.* April, 1890.)

INJUNCTION—CONTEMPT.

The National Trotting Association, an organization composed in part of driving park and track associations, and organized for the promotion of trotting interests, was enjoined from investigating a charge of fraud then pending before a committee of the association known as the "Board of Review," or from passing any order of suspension or expulsion in the case, or from taking any further action in respect to said charge. *Held,* in proceedings for contempt, that the Congress of the National Trotting Association, composed of the owners and representatives of each local race-course within this association, being a different organization, and created for other purposes, could suspend the plaintiff from all privileges on the courses in membership with the National Trotting Association until the injunction was dissolved, and the charge of fraud legally investigated by the board of review.

Action by the Standard Stock Farm, Frank L. Noble, and George Robens against the National Trotting Association, P. P. Johnson, of Lexington, Ky., M. J. Bukeley, of Hartford, Conn., and John L. Mitchell, of Milwaukee, Wis. This is a motion to punish the National Trotting Association and Philip P. Johnson, as president, for contempt in disobeying a preliminary injunction order made in February, 1890, by a justice of this court, at chambers.

*Norris Morey* and *M. J. Smiley,* for plaintiffs. *Daniel N. Lockwood* and *William B. Hoyt,* for defendants.

CORLETT, J. The National Trotting Association was organized in 1870, and incorporated in 1884, in the state of Connecticut; its head-quarters being Hartford. Its officers are a president, secretary, treasurer, and board of appeals, consisting of 15 in number. The present president is Phillip P. Johnson, of Lexington, Ky. The association adopted by-laws defining the duties

of the officers of the corporation.   The following by-laws, rules, and regulalations are among those adopted:

Article 2.   Section 1.   "This association shall have for its object the improvement of the breed and the development of horses, through the promotion of the interests of the American trotting turf, the prevention, detection, and punishment of frauds thereon, and uniformity in the government of trotting and racing."

Article 3.   Section 1.   "The officers of this association shall consist of a president and two vice-presidents, to be designated as ' first and second vice-presidents,' and a secretary and treasurer.   The duties of the secretary and treasurer may be discharged by the same person."

Article 4.   Section 1.   "The president shall be *ex officio* a member of the board of review and district boards, and when present shall preside at all meetings of the association, and the board of review and district boards, and he shall have the casting vote at such meetings; and whenever, upon verified petition, he shall believe there is injustice or illegality in any penalty imposed by an associate member, he may temporarily remove or modify the same until a meeting of the proper board having jurisdiction of the matter."

Article 7.   Section 1.   "The board of appeals shall have general management, control, and superintendence of the affairs of this association, subject to the rules, regulations, and by-laws."

Article 7.   Sec. 2.   "To the board, through the secretary, must be addressed, in writing, all charges against any member of this association, or other communications intended for their action."   Sec. 3.   "The board shall examine all evidence of fraud, or any other matter relating to the turf, that is brought before them, and shall take such measures to ascertain the truth or falsity of all charges as they shall deem necessary and proper, and they shall pass judgment in each case; and they shall have authority to fine, suspend, or expel any member who shall refuse to obey the laws of the association or the orders of the board, and any member failing to pay a fine so imposed may be suspended until such fine is paid: provided, that such fines shall not in any single case exceed $100.   And it is further provided that the president, upon complaint made, and after ascertainment of the truth thereof, that a member has failed to pay premiums won for more than ten days, shall order such member to be suspended until such premiums be paid, or deposited with the treasurer of the National Association."   Sec. 4.   "The board of appeals shall consist of not more than fifteen members, besides the president and vice-president, to be chosen as afterwards provided."   Sec. 5.   "As a part of the system established under these by-laws, there shall be, and there are hereby, created five judicial districts, as follows:   District No. one, to be known as the 'Eastern District,' composed of the New England states and the Dominion of Canada, and other foreign countries, having for its place of meeting the city of Hartford, Conn.; district No. two, to be known as the 'Atlantic District,' composed of the states of New York, Pennsylvania, Delaware, Virginia, New Jersey, Maryland, and the District of Columbia, having for its place of meeting the city of New York; district No. three, to be known as the ' Central District,' composed of the states of Ohio, Indiana, West Virginia, Kentucky, Missouri, Arkansas, Louisiana, and all the states south of the southern border of Virginia and Kentucky, having for its place of meeting the city of Cincinnati, O.; district No. four, to be known as the ' Western District,' composed of the states of Illinois, Wisconsin, Minnesota, Michigan, Iowa, and Texas, and all the western states and territories not included by name in this or other districts, having for its place of meeting the city of Chicago, Ill.; district No. five, to be known as the ' Pacific District,' composed of the states of California, Oregon, and Nevada, having for its place of meeting the city of San Francisco, Cal."   Sec. 6.   "Three members of the board shall be chosen in each judicial district, who shall constitute a district board for such district, of which board

the president and vice-president shall be *ex officio* members." Sec. 7. "The president shall from time to time select one of the three members of the board in each judicial district to be chairman of the board for such district; and the five chairmen thus chosen shall constitute a board of review, of which the president and vice-president shall be *ex officio* members. After a meeting of the board of review, and before another meeting of the board, the president shall again select the chairman in each of the said five districts, changing the chairman in each district when practicable. The president may act as referee in any case wherein the parties thereto so request, and in such case his decision shall be final." Sec. 8. "Each of said district boards shall have jurisdiction on all questions of fraud, or other matters relating to the turf, arising in said district." Sec. 9. "The board of review shall possess the authority conferred upon the board of appeals, and may perform any of the offices and duties which, under the by-laws and rules, devolve upon said board of appeals. They shall hear all appeals from the decisions and rulings of the district boards, and they may hear appeals from the decisions and rulings of the judges of any race, and of the several associate members; and they shall pass judgment in each case, from which there shall be no appeal." Sec. 10. "Each district board shall meet upon the call of its chairman, or of the president. In all meetings of a district board, two members, exclusive of the *ex officio* members, shall be a quorum for business." Sec. 11. "The board of review shall hold a meeting on the first Tuesday of December, 1880, in the city of New York; and thereafter they shall hold a regular meeting on the first Tuesday of December in each year, as they shall determine: provided that, if the board shall, at its first or any regular meeting, omit to determine the place of its next meeting, the president shall designate the place. In all meetings of the board of review, three members of the board, exclusive of the *ex officio* members, shall constitute a quorum for business. Special meetings of the board of review shall be held when ordered by the president." Sec. 12. "In all meetings of either district board or board of review, notice shall be sent to the members of the board by the secretary, through the mail, not less than fifteen days prior to the meeting." Section 13 relates to the subject of costs. Section 14 is upon the subject of rehearings. Section 15 is that no member of a district board shall sit in a case once heard before him. The other sections of article 7 throw no light upon the present controversy.

Article 8. Section 1. "A delegation to a general congress or any association meeting shall consist of one person, duly authorized in writing by the president or secretary of their respective associations, or proprietor or proprietors of individual courses."

Art. 12. Section 1. "It shall be the duty of each associate member to see that the rules, regulations, and by-laws of this association are rigidly enforced upon their respective courses, under penalty of suitable fine or expulsion." Sec. 2. "Members shall not allow their courses to be used for exhibitions of a character degrading to the public standing of the National Trotting Association, and they shall be held responsible before the board of review for any violation of the rules of this association." Sec. 3. "They shall keep on file, for future reference, all letters, entries, and communications relating to their respective courses." Sec. 4. "It shall be the duty of each member to forward by mail, as registered matter, to the secretary of said National Association, within one week of the close of each meeting, the 'Judges' Book,' or official record of the meeting or race, said record to contain the date, the amount or value of the purse, match, or sweepstake, the full terms and conditions of the race, all the entries received for the same, the position of each and every horse in each heat, the drawn, distanced, and ruled-out horses, the official time of each and every heat, the signature of the judges, and such notes and remarks as are necessary for an understanding of the whole." Sec. 5. "Members shall furnish to the secretary the names of all persons and horses that have been

fined, suspended, or expelled, together with the amount of fines and terms of suspension.  They shall also furnish a list of the officers of their respective associations or courses, with their post-office address."

Article 14.  Section 1.  "There shall be a meeting or congress of the members of this association, biennially, on the second Wednesday in February, at such place as may be chosen at the meeting next preceding.  A written or printed notice of each meeting shall be mailed, postage paid, and addressed to the secretary of each member, at least thirty days prior to such meeting." Sec. 2.  "Each member shall be entitled to one vote, and may vote by a delegate duly authorized, who shall have the power of substitution."

Article 20.  Section 1.  "The president may employ a trusty man or men to visit any trotting meeting or meetings, to learn if the rules of this association are properly observed, and to take the time of the horses in any heat or heats trotted or paced at such meeting.  Such supervisor or supervisors shall have authority to inspect the records and entries in possession of any members, when so directed by the president.  The report of such supervisor or supervisors as to said matters shall be received by the board of review as evidence in any investigation by the board relating thereto."  Sec. 2.  "Any member, or the judges of any member, or any party, thus reported guilty of violating said rules, shall be by the president reported to said board."  Section 3 confers the same power upon each member of the board of review as supervisors possess.

Rule 1.  Section 1.  "All trotting and pacing engagements and performances over the several courses which are or shall be represented by membership in the National Trotting Association, and each and every person who shall in any way be concerned or employed therein, as well as all associations and proprietors themselves who are or shall become members of said National Association, shall be governed by the following rules from and after February 8, 1888."

Rule 6, § 3, provides for the description, names, and pedigrees of horses to be entered, and punishment by the board for deception.  Rule 14 prescribes punishment for fraudulent entries, alterations, or concealment of identity, and provides for punishment.  Rule 15 provides for a reward for disclosing fraud.  The provisions of rule 16 relate to the manner in which races shall be carried on, the withholding of premiums, and upon the making of protests, investigation, and punishment.

Rule 26.  Section 1.  "The judges of the day or race shall have authority, while presiding, to appoint distance and patrol judges and timers to inflict fines and penalties, as prescribed by these rules; to determine all questions of fact relating to the race over which they preside; to decide respecting any matters of difference between the parties to the race, or any contingent matter which may arise, such as are not otherwise provided for in these rules; and they may declare pools and bets 'off' in case of fraud, no appeal to be allowed from their decision in that respect.  But all their decisions shall be in strict conformity with the rules, or with the principles thereof.  They shall have control over the horses about to start, and the riders or drivers and assistants of the horses; and, in the absence of other provision in these rules, they shall have authority to punish, by a fine not exceeding $100, or by suspension or expulsion, any such person who shall fail to obey their orders or the rules."

Rule 41.  Section 1.  "In any public race, if there shall be any intentional suppression or misrepresentation in either record or the announcement of the time of any heat in the race, it shall be deemed fraudulent; and any horse winning a heat, or making a dead heat, wherein there was such a fraudulent suppression of time, together with the parties implicated in the fraud, shall by the operation of these rules be henceforth disqualified from the right to compete on the grounds of the members, which disqualification may be re-

moved by order of the board of review when, upon investigation, the board shall believe that the constructive fraud was not premeditated, but only then upon a restitution or return to the custody of the treasurer of this association of any premiums that under any circumstances have been awarded such horse on the ground of members during the time of disqualification, and upon the payment of a fine of $100, to go to this association, the fine to apply to the horse regardless of any change in the ownership." Sec. 2. "A fine of $100 shall be imposed upon any member of this association on whose grounds there shall be allowed any suppression of time as aforesaid, one-half of said fine to be paid to the informer upon recovery; and time shall be deemed to have been suppressed in any race wherein a record of the same has not been kept in writing, whether on associated tracks or others." Sec. 3. "Any person who shall, as judge or timer, be guilty of fraudulent suppression of time in any public race, shall be expelled from the courses of all members."

Attention has not been called by counsel on either side to other rules or by-laws which are claimed to bear upon this application.

There are over 300 local trotting associations in the United States and Canada which are members of the National Trotting Association. There is another trotting association, known as the "American," within the same territory, which has no connection with this association. There is a corporation, known as the "Standard Stock Farm," organized under the laws of the state of Michigan, located and having its principal office at Grand Rapids, of which Frank L. Noble is president. The Standard Stock Farm owns a trotting stallion known as "Alcryon." On the 23d day of September, 1889, on Beacon Park Track, Boston, this horse trotted in the Balch Ten Thousand Dollar Stallion race, and was driven by one of the plaintiffs, George Robens. The owners of the track were Jordan, Marsh & Co. They leased it to George H. Hicks, but on the day of the race the track was in the charge and under the control of Wesley P. Balch. The lessee, Hicks, was a member of the National Trotting Association, but neither the owners nor Wesley P. Balch were members. None of the plaintiffs were ever members of the National Trotting Association, or of any of its local members. The race was won by the stallion Nelson, owned by C. H. Nelson, of Maine, who was not a member. The defendant's position is that previous to this race the plaintiff Noble entered into a conspiracy with C. H. Nelson, the owner of the horse of that name, whereby it was agreed that Alcryon should lose the race, in consideration of which Noble should receive $5,000, and $2,000 in addition thereto, called the "second money;" that, to carry out the arrangement, Noble so caused his horse to be shod that he could not win the race. It is also claimed that Noble received the money agreed upon. No complaint was made at the time of the race, nor does it appear that any of the alleged facts were known at that time by the defendant, or the person from whom it afterwards obtained information. On the alleged discovery of the fraud, charges were preferred, and preliminary steps taken for a trial on the 3d day of December, 1889, in the city of New York. An adjournment was had to the Iroquois Hotel, in the city of Buffalo, to the 11th day of February, 1890, for the purpose of trying the charges. The board of review before whom the matter was to be tried consisted of P. P. Johnson, of Lexington, Ky., the president; John L. Mitchell, of Milwaukee, Wis.; M. J. Payne, of Kansas City, Mo.; and Jesse Carr, of Salinas, Cal. The committee met at the Iroquois Hotel on the day of the adjournment, for the purpose of trying the case. The plaintiff appeared before the tribunal, and urged various objections against proceeding to trial, all of which were overruled. Thereupon the plaintiffs brought this action. The complaint alleges that the horse Alcryon was of the value of $35,000; that he was a rapid trotter, and had made 2:15¼, and could make better, but that, in order to realize profits, it was needful that the horse, and those having charge of him, should be admitted upon the race tracks of the

local associations, upon paying the proper amount of entrance fee, to compete for the prizes, and on complying with the rules.   It then alleges, in substance, that the plaintiffs were charged with fraud in the Boston race by the defendants, and that the board claimed to have jurisdiction to hear and determine whether they were guilty of this charge, and, if it so adjudged, that a fine might be imposed by way of punishment; also, that the plaintiffs might be expelled, and that the horse and its owners would be excluded from all right to compete at the races, and that thereby irreparable damage would be inflicted.   The complaint also charges that the tribunal had no jurisdiction to hear and determine the questions of fraud on various grounds.   The prayer is "that it may be adjudged and decreed by this honorable court that the said National Trotting Association and the said board of review are attempting to proceed without right, authority, or jurisdiction to try and determine the said questions of fraud, and that it may be decreed by this honorable court that the said board of review has no right, authority, or jurisdiction to fine, suspend, or expel the said horse Alcryon, or the said Frank L. Noble and George Robens, and that the said tribunal is improperly constituted to try the said charge, and that the said National Trotting Association and the said board of review, composed of P. P. Johnson, M. J. Bukeley, John L. Mitchell, and M. J. Payne, and their successors, may be restrained and enjoined from attempting to try the said charge of fraud, and especially that they be restrained and enjoined from entering in said cause an order, judgment, or decree of fine, suspension, or expulsion against the said horse Alcryon or the said plaintiffs, or any of them, and that the said plaintiffs may have such further and other relief in the premises as the nature and circumstances of this case may require, and as to this honorable court shall seem meet."   It further asked for a preliminary and permanent injunction.   Upon this complaint, and affidavits tending to support it, an injunction order was granted by a justice at chambers, of which the following is a copy: "Ordered, that the defendants, and each of them, and their and each of their attorneys, counsel, agents, assistants, and successors in office, be, and each of them, is under the penalties prescribed by law, enjoined and restrained, until the further order of the court in the premises, from trying, or attempting to try and investigate, the charge of fraud heretofore made and now pending before the board of review of the National Trotting Association against the plaintiffs Frank L. Noble and George Robens, or either of them, or from passing, or attempting to pass, any order of judgment or decree of fine, suspension, or expulsion against the horse Alcryon and his owner, or the said Frank L. Noble and the said George Robens, upon or on account of any charge pending against said parties or said horse, before said board of review, for alleged fraud in the ' Balch Ten Thousand Dollar Stallion Race,' so called, trotted at Boston in the month of September, 1889, or from taking any further action or proceeding upon or in respect to said charge, or any part thereof."   On the 11th day of February the injunction order was served on the members of the committee, also on the corporation by service on its president.   On the 12th day of February, at the Iroquois Hotel, the following resolution was adopted: "Whereas, the board of review has been restrained by the court from investigating the charge of fraud pending against C. H. Nelson, Frank L. Noble, George A. Robens, and the stallions Nelson and Alcryon, therefore, it is resolved by the Congress of the National Trotting Association that the said persons and horses are hereby suspended from all privileges on the courses in membership with this association until said injunctions are dissolved, and the said charges are legally investigated by the board of review."   It thus appears that there is a congress composed of a representative from each local race-course.   On the 13th day of February this application was made, and an order to show cause granted on the affidavits of M. J. Smiley and William M. Cramer.   The order and affidavits were served on Johnson, the president.   Affidavits were pre-

sented on the part of the defendant in opposition to the application made by the president and George W. Archer, and a verified answer, which puts in issue the material allegations in the complaint so far as it questions the jurisdiction of the committee to try the case for fraud, and the regularity of the proceedings.    The following is a copy of the president's affidavit:

"Philip P. Johnson, being duly sworn, deposes and says that he is the president of the said defendant, the National Trotting Association, and is also one of the defendants in this action; that said defendant, the National Trotting Association, is an organization of men, and incorporated and unincorporated driving park and track associations, organized for the promotion of the trotting interests, as specified in its charter; that this defendant, the National Trotting Association, owns no real estate whatever in any state in the Union to deponent's best knowledge, information, and belief, and owns and possesses no personal property of any kind in the state of New York, and none elsewhere, except the annual dues paid to such society by the members thereof, and other sums paid as fines, all of which is used exclusively for the expenses of administration; that the exact amount of such personal property deponent is unable to state.    And this deponent further says that, to the best of his information and belief, the plaintiffs in this action, and neither of them, is or ever has been a member of this said association, and are not members of any of the courses in membership with the said defendant, the National Trotting Association; that said plaintiffs have no interest in any of the property belonging to this said defendant, and are in no way connected with said defendant.

"And deponent further says that, on the 11th day of February, 1890, there assembled at the Iroquois Hotel, in the city of Buffalo, N. Y., a committee of said association called the 'Board of Review;' that said board of review was composed of deponent, Philip P. Johnson, of Lexington, Ky., John L. Mitchell, of Milwaukee, Wis., M. J. Payne, of Kansas City, Mo., and Jesse D. Carr, of Salinas, Cal.; that, among other questions that were to come before said board of review for further investigation, was a charge of fraud against these plaintiffs and others in connection with what is called the 'Balch Ten Thousand Dollar Stallion Race,' trotted at Boston, upon the Beacon Park Track, in September, 1889; that, as deponent understands and believes, the said Beacon Park track was at the time of the said race owned by one Hicks as lessee, who was then, and for many years had been, and is, a member of the said National Trotting Association, and said track was one of the associate courses mentioned in rule 1 of said National Association, and that said race was advertised to be and was trotted under its rules and regulations, and all entries in said race were made under such rules and regulations, and the judges selected for and officiating at were officers and members of the said National Trotting Association; that thereafter, and on the 11th day of November, a report of fraud in connection with said race was duly made to this association by Mr. George W. Archer, a member of the board of appeals thereof, as provided by the laws, rules, and regulations of this association, and that said report became and was evidence in any investigation of such charge; that subsequently notice was given to these plaintiffs, and to Charles H. Nelson, the owner of the horse Nelson, to appear before the board of review, which is the committee of the said association charged with the duty of investigating such charges of fraud, at a meeting of such board to be held in the city of New York on the 3d day of December, 1889, to answer the charge of fraud which had been made against them; that said board, after a preliminary investigation as provided by its by-laws, having decided that said charge of fraud should be further inquired into, the plaintiffs Noble and Nelson then appeared before such board personally and by counsel, such counsel being M. J. Smiley, Esq., of Grand Rapids, Mich., who appeared for Mr. Noble, one of the plaintiffs, and H. M. Whitehead, Esq., of New York city, who appeared for C. H. Nelson,

and interposed certain objections to the power and jurisdiction of such board to investigate such charge of fraud; that such board, after duly and carefully considering the questions so raised by such counsel, decided that they had the power and right to investigate such charges, and that such investigation would proceed; that such board believed that they had the right to investigate such charges under their by-laws, rules, and regulations, as for many years had been their custom and practice in similar cases; that thereupon these plaintiffs and said Nelson, whose cases were jointly to be considered as one case, requested an adjournment of such investigation until they could produce certain witnesses and testimony in their behalf, and in compliance with such request the said board of review thereupon postponed and adjourned all further investigations of such charges of fraud to the 11th day of February, 1890, at the Iroquois Hotel, in the city of Buffalo, N. Y.; that on the 11th day of February, 1890, the said plaintiffs Noble and said Nelson appeared before said board at the Iroquois Hotel, at Buffalo, N. Y., and requested that such investigations be adjourned until its next meeting, which would occur in May, 1890, at Chicago, Ill.; that said board refused to further postpone its investigations, and notified said parties that such charges would be investigated on the following day; that the various witnesses were in attendance at such meeting to give testimony, in reference to such charges, and had come long distances from various parts of the United States. Immediately upon the said board declining to further postpone such investigation of such charges of fraud, the said Nelson and these plaintiffs, by their attorneys, served upon said National Trotting Association, by delivering to this deponent, as president thereof, the summons and complaint in this action, affidavit of Norris Morey, and an undertaking and an injunction order theretofore issued by this honorable court in this action, enjoining and restraining these defendants therein named, the said National Trotting Association, and the other parties defendant, their agents, etc., from proceeding any further in the investigation of such charge of fraud against said plaintiffs and their horse Alcryon. That no other papers in this action were served on deponent or said association; that a summons and complaint in the action of Charles H. Nelson against the same parties, with a similar injunction in their case, were also served; that thereupon the defendants in such action retained Messrs. Humphrey, Lockwood & Hoyt, attorneys at law, of the city of Buffalo, to defend such action; that, after an examination of the papers and the injunction order herein, said attorneys advised the defendants that the injunction order retrained said defendants from investigating the charges of fraud in said Balch ten thousand dollar race, and from passing any judgment or decree on account of said fraud in such race, or taking any further proceedings in relation to such charge, and that the judgment which was prayed for in said complaint was a decree forever restraining such defendants, their agents, etc., from ever investigating such charges of fraud, or passing any judgment in the said proceeding then pending before said board of review. And deponent further says that he and others in attendance upon said meeting also read such injunction order, and the papers upon which it was based, and deponent understood that this honorable court had directed that such defendants proceed no further in the investigation of the charge of fraud pending in said case, which was numbered 1,935, before such board of review, or from doing any act in reference thereto; that thereupon the board of review adjourned without taking any further steps in said matter, and on the next day their term of office expired, and a new board was elected.

"And deponent further says that, on the 12th day of February, there convened at the Iroquois Hotel a congress of the members of the National Trotting Association; that the persons in attendance at the said congress were the owners of the driving tracks in membership with the defendants, or represented such owners; that, as he understands, such tracks are private and in-

dividual property, and that the owners thereof assembled in congress, or each for themselves, can make such conditions, limitations, and regulations in reference to the purses or horses to be allowed to compete therefor as they deem best; that they may refuse any horse or person the privilege of entering upon their tracks, or competing for their premiums, and that such owners frequently exercise that right; that, as deponent is informed and believes, certain of the owners or representatives of the owners of such tracks declared that they would not offer any premiums on their tracks for which the said owners. of the horses Nelson and Alcryon, or such horses, might compete; that, under the circumstances of such alleged fraud, many owners would be deterred from entering their horses in any contest wherein such parties might take part, and they are advised that it was not the purpose of said injunction to compel them to associate with the plaintiff, in the face of his confession of conduct degrading to the turf, though they were restrained from further investigating or punishing the same; that it is of great importance to each track association to have as many entries in each race as possible, as each horse entered is required, under the rules, to pay ten per cent. of the premium; that certain of such track owners and representatives consulted H. M. Whitehead, Esq., counselor at law, of New York city, who has had long experience at the bar of the state of New York, and especially familiarity with the organization of the National Trotting Association, and he advised them, after an examination of the said injunction order, and the papers upon which it is based, that the said injunction order did not, in letter or in spirit, restrain them from refusing the privileges of their tracks to such parties and horses. Mr. Whitehead was counsel for said C. H. Nelson in the proceedings before the board of review in New York. That, when this matter was brought to deponent's attention, he likewise consulted Mr. Whitehead, and he advised him that a resolution withdrawing from said parties the privileges of the associated tracks was not prohibited by said injunction order; that he also consulted his attorneys in this action, and they also advised him to the same effect, and he believed and understood, after reading said order, and the papers. upon which it was based, that such act was not intended to be, and was not, prohibited; that the resolution set forth in the moving papers was not intended to violate the injunction, or as a punishment for the alleged fraudulent conduct of the said Noble which the board was restrained from investigating, but the congress thought it had the right to say, by the resolution complained of, that they did not wish the plaintiff's company, nor any business transactions with them, at least until after the matter referred to in the complaint had been investigated. The resolution does not, and was not intended to, have any further effect than this. That thereafter the resolution stated in the papers herein was passed by the congress of this association without a dissenting voice; that deponent entertained such motion, believing that. such act on his part, either individually or as president of said association, was not prohibited by the order of this honorable court; that the meeting was. an open and public meeting; that there was no attempt at secrecy or concealment, and no intention, in entertaining such resolution, of evading or disregarding the order of this court; that neither the board of review, nor the National Trotting Association, nor any officer thereof, nor any person connected therewith, as he understands and believes, has taken any proceeding in the said charge of fraud pending before said board of review since the service of such injunction order herein. And deponent further says that the plaintiff Robens was suspended from the associate courses in October, 1889,. and is now under such expulsion. Deponent asks that this affidavit may be used on the two orders to show cause herein."

It appears by this affidavit that, upon the service of the injunction order, the court or committee before whom the case was to be tried adjourned; that, on account of the expiration of time, a new committee was appointed in their

place; and that thereupon the congress assembled at the same hotel, and passed the above resolution.

The sole question upon this application is whether, in adopting the resolution above quoted, those engaged in it were guilty of contempt, by violating the injunction order. In addition to the above affidavit, the answer denies a violation or intention to violate the injunction. The affidavit of Archer contains, among other things, the following: "That deponent has been connected with the Rochester Driving Park since 1874, and has attended many meetings of the congress; that he is familiar with the driving park associations of this country, and with their method of doing business, and, as he understands and believes, such tracks are private property, and that the owners thereof individually, or collectively in congress assembled, may make such conditions, limitations, and regulations as to the premiums that shall be offered on their tracks, or the persons or horses who shall be allowed to compete therefor, as they individually or collectively deem best, and that they frequently exercise that right." It thus appears that the corporation has five judicial districts, which include Canada and the United States; that tribunals exist, which are a part of the machinery of the corporation, to try and determine questions which may arise, impose penalties, and inflict punishment; that this court or tribunal consisted of four members. It also appears that there is within the corporation a congress which represents not only the corporation, but the numerous local organizations which are members. No question is made but that the injunction was obtained for the purpose of preventing the defendants from trying the plaintiffs on the charges of fraud, and punish them in case of conviction. The action was brought for that purpose. The structure of the complaint, the form of the prayer for relief, the rules and by-laws, all of which are made a part of the complaint, clearly show the relief sought by this action. The numerous allegations in the complaint alleging want of power and jurisdiction in the tribunal to try and determine show that the pleader proceeds upon the assumption that, if the tribunal was not regular, or lacked jurisdiction, its decisions would be nullities. The plaintiffs sought before the tribunal to obtain an adjudication in their favor of the jurisdictional questions by way of preliminary objection. It was not until after a ruling against them on those questions that this action was brought, and the injunction obtained. It is not alleged, and nowhere appears, that the congress, as such, has any power or jurisdiction to try and determine charges, or inflict punishments. Its functions seem to be legislative and executive, not judicial. The primary object and purposes of the congress seems to be to secure the rights and privileges of the local organizations, and produce uniformity and harmonious action between the central corporation and the numerous race-courses which are members. These local associations appear to be owned by private individuals; the central corporation having no legal title to the property. But, for the purpose of furthering the objects for which the corporation was formed, to secure equality, uniformity, and harmony,—in short, for the interests of the central corporation, and all its branch members,—a congress was created, so that all branches of the corporation should be fully represented, and its business harmoniously carried on.

Construing the injunction order and the resolution of the congress in the light of these suggestions, it is very clear that the parties charged are not guilty of contempt. No steps were taken by the tribunal enjoined, or any of its members, to proceed with the trial after service of the injunction order. On the other hand, the body adjourned; the term for which its members were elected expired; new persons were chosen to perform judicial duties; and then the congress assembled. It is entirely immaterial whether the individuals composing the congress, or whether the president of the corporation, or the members of the judicial tribunal, formed a part of that body. It was a different organization, and created for other purposes. A reference to the

preamble of the resolution complained of shows that the injunction order is treated by the congress as applying to, and restraining, the board of review. There is nothing in the preamble or body of the resolution indicating any intention or purpose to disregard, or in any way violate, the injunction. Its resolution was to suspend the plaintiffs and their horses from all benefits of the local organizations until after the trial and determination of the question of fraud by the judicial tribunal. So long as grave questions remained undecided, the congress proceeded upon the assumption that the interests of the corporation and its branches would be advanced by preventing the plaintiffs or their horses from participating in its benefits until the accusations were tried and judicially determined according to the rules of the corporation. Interest, progress, fair dealing, and reputation often require action during the pendency of proceedings in order to preserve the reputation and advance the usefulness of the corporation. It may be true that personal animosities and bitter partisanship had arisen between the parties to this controversy, and that those considerations produced prompt and extreme action. It also may be true that the practical effect of the resolution, if carried into execution, will inflict great injury and loss upon the plaintiffs. But these considerations throw no light upon the question whether its adoption was a violation of the injunction. Those passing the resolution did not assume any right or power to take the place of the trial tribunal, or to adjudge upon any of the questions involved in the action; but, as a body representing the corporation and its branches, it did assume to have the right to pass any resolution it saw fit, which in its judgment would be a benefit to the corporation, in case it did not violate the injunction. If the passage of the resolution resulted in inflicting injury upon the plaintiffs, no reasons are seen why the plaintiffs have not a remedy at law to recover damages against those unlawfully interfering with their rights. But an injunction order, granted upon specific grounds, to restrain the performance of certain alleged acts, cannot be treated as violated because other action may be taken, even though those acts may inflict as much injury as a performance of those restrained by the injunction, assuming it does not embrace the acts restrained. Every wrong has its appropriate remedy; but a precise remedy, applicable to peculiar acts, cannot be invoked in support of different acts, though they may be wrongful, if not within the scope or compass of the original remedy. The fact that the obtaining of the injunction may be the sole cause of the passing of the resolution is unimportant. Suppose the congress had said in so many words: "Because you brought your action, and obtained the injunction, and prevented a trial, we will resort to another remedy, which will inflict quite as much injury upon you as if you had allowed us to proceed in the matter restrained." It is obvious that that act, no matter what motives inspired it, could not be treated as a violation of the injunction order, or a contempt of court, unless it was a direct or indirect attack upon the order or its effect. The test is not what injury the proposed action will inflict, but whether it is a violation of an order of the court. A resolution, by a body not judicial, to deprive a person of rights and privileges, cannot be treated as a violation of an order of the court, unless it in some way interferes with it, or prevents its execution. In this case the congress had power to pass the resolution adopted, provided it in no way interfered or infringed upon the injunction order. The fallacy of the plaintiffs' position is in assuming that the injunction is broad enough to include all the actions and doings of the corporation or its branches which may tend to injure the plaintiffs.

In Rapalje on Contempts, (page 57,) the rule is stated that an injunction prohibiting use as a tow-path would not be violated by its use for other purposes. *Bosley* v. *Canal*, 3 Bland, 63–68. There is no obscurity or ambiguity about the order or its purposes, and the matters to which it relates. It is not perceived that the passage of the resolution in any way tends to

impair its sufficiency, or detract from its force. In *Laurie* v. *Laurie*, 9 Paige, 233, it was held that "an injunction should be clear and explicit in its terms, and should not deprive the defendant of any right which the case made by the bill does not require he should be restrained from exercising." So, in *Sullivan* v. *Judah*, 4 Paige, 444, it was decided that "an injunction should upon its face contain sufficient to apprise the party upon whom it is served what he is restrained from doing, without the necessity of his resorting to the complainant's bill to ascertain what the injunction means." In *Plaster Co.* v. *Seabury*, 1 N. Y. Supp. 134, it was held that, "in order to punish for a violation of an injunction, the act complained of must be clearly embraced within the inhibited acts." In the court of appeals, *Bank* v. *Habel*, 58 How. Pr. 336, it was held that, "in order to punish for a violation of an injunction, the order should clearly embrace the act complained of." It is a familiar rule that an injunction in no way interferes with the possession or exercise of control over property, unless such acts are prohibited in the order. *Hemingway* v. *Preston*, Walk. (Mich.) 528; *People* v. *Simonson*, 10 Mich. 335. Applying the doctrine of these cases to the one at bar, it is very clear that the resolution is no violation of the injunction. The complaint, injunction order, and all the allegations on the part of the plaintiffs, were framed for the purpose of preventing a trial and adjudication. The numerous authorities cited by the learned counsel for the plaintiffs have been carefully examined, but none of them conflict with the doctrine of the above cases. The application must be denied, but, in view of the novelty of the questions, without costs.